UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS, NEVADA


UNITED STATES OF AMERICA,          )
                                   ) Docket No. 2:11-CR-0365-JCM-RJJ
             Plaintiff,            )
                                   )
          vs.                      )
                                   )
KEVIN McAULIFFE,                   )
                                   ) Las Vegas, Nevada
             Defendant.            ) January 13, 2012
                                   ) 10:00:56 a.m.
_____    )
And related cases and parties)


**PORTION OF IMPOSITION OF SENTENCE
TESTIMONY OF DR. TIMOTHY FONG**



THE HONORABLE JAMES C. MAHAN, PRESIDING
DISTRICT JUDGE OF THE U.S. DISTRICT COURT




COURT RECORDER:

EILEEN STERBA
U.S. District Court




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2:11-CR-0365-JCM-RJJ       U.S. v. McAuliffe       1/13/12       **Portion of Sentencing
Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                          1

APPEARANCES:


FOR THE PLAINTIFF:          CHRISTINA M. BROWN,
                            Assistant U.S. Attorney
                            333 Las Vegas Boulevard South, #5000
                            Las Vegas, Nevada 89101
                            christina.brown@usdoj.gov



FOR THE DEFENDANT:          MARGARET M. STANISH, Esq.,
                            Wright Stanish & Winckler
                            300 South Fourth Street, Suite 701
                            Las Vegas, Nevada 89101
                            Mstanish@wswlawlv.com



ALSO PRESENT:               WENDY BECKNER,
                            MIKE MASTRANGEOLI,
                            RICK OEHLERKING
                            U.S. Probation Office

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                                    2

WITNESS and EXHIBIT INDEX

**Witnesses**

WITNESSES FOR THE PLAINTIFF:                          PAGE #

**None.**


WITNESS FOR THE DEFENDANT:

**DR. TIMOTHY FONG**
       Direct Examination by Ms. Stanish            4
       Cross-Examination by Ms. Brown              17
       Redirect Examination by Ms. Stanish         51

* * * * *



**Exhibits**

EXHIBITS FOR THE PLAINTIFF:                          ADMITTED

Exhibit 1       South Oak Gambling Screen              35



EXHIBITS FOR THE DEFENDANT:

None.

* * * * *

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com           3

```
                          FONG - DIRECT
```

1 | LAS VEGAS, NEVADA                    FRIDAY, JANUARY 13, 2012

2 |                          * * * * *

3 |           PROCEEDINGS BEGAN AT 10:00:56 A.M. AND

4 |             NOT TRANSCRIBED UNTIL 10:12:54 A.M.

5 |                          * * * * *

6 |      DR. TIMOTHY FONG'S TESTIMONY BEGAN AT 10:12:54 A.M.

7 |                          * * * * *

8 |           THE COURT:  So, Dr. Fong, if you would come forward

9 | and be sworn please, sir.

10 |           **TIMOTHY FONG, DEFENDANT'S WITNESS, SWORN**

11 |           THE CLERK:  Please have a seat.  Would you please

12 | state your full name, spell your last name for the record.

13 |           THE WITNESS:  Fong, F-O-N-G.

14 |                         **DIRECT EXAMINATION**

15 | BY MS. STANISH:

16 | Q   Dr. Fong, would you please briefly explain what you do

17 | for a living?

18 | A   I'm sorry?

19 | Q   Would you please explain what you do for a living,

20 | briefly?

21 | A   Sure.  Currently I am an Associate Professor of

22 | Psychiatry at the UCLA School of Medicine.  I am the co-

23 | director of the UCLA Gambling Studies Program.  A gambling

24 | studies' program is a research and treatment program to

25 | understand the causes of pathological gambling or gambling

FONG - DIRECT

1  addiction as well as to provide treatment to patients with

2  gambling addiction and affected individuals of gambling

3  addiction.

4  Q    And did you have the opportunity to evaluate Monsignor

5  McAuliffe?

6  A    I did.

7         MS. STANISH:  Your Honor, may he take a seat for

8  now?  Since we're --

9         THE COURT:  Oh, sure.  Yes.  Sure, that's fine.

10  BY MS. STANISH:

11  Q    Yeah.  Why don't you have a seat, you're bugging me

12  there.  And what was the result of your evaluation of

13  Monsignor McAuliffe?

14  A    So my professional medical opinion of his diagnosis are

15  number one, pathological gambling; number two, major

16  depressive order; and number three, social anxiety disorder.

17  Q    Let's start --

18         THE COURT:  I'm sorry, say that again?  What is the

19  third one?

20         THE WITNESS:  Social anxiety disorder.

21         THE COURT:  Thank you.

22  BY MS. STANISH:

23  Q    Let's define each of those, maybe starting backwards

24  with social anxiety disorder.

25  A    Okay.  So after my evaluation of Father McAuliffe, those

FONG - DIRECT

1  three psychiatric diagnoses I came to, based on my clinical

2  experience as well as my interview and evaluation of the

3  signs and symptoms that he would report.  The social anxiety

4  disorder is a psychiatric disorder characterized by elevated

5  levels of anxiety around social situations.  Fear of

6  criticism, fear of scrutiny that creates a lot of internal

7  anxiety and distress about doing things in a social

8  situation.

9  Q    And what about the depression?

10 A    The major depressive disorder I characterize as a mood

11 order whereabouts a person will experience bouts, signs and

12 symptoms of depressive moods; cognitive distortions about

13 mainly negative views of themselves and the world; coupled

14 with impairments over sleep, concentration, memory, and other

15 associated symptoms.

16 Q    Now, if I have time I'll come back to those two

17 disorders but I want to spend most of your time talking about

18 gambling addiction.  What is a pathological gambling

19 addiction?

20 A    So pathological gambling or other -- otherwise known as

21 compulsive gambling or gambling addiction is a psychiatric

22 condition or as we say in our community, very much a brain

23 disease.  It's characterized by the loss of control over

24 gambling, a preoccupation with gambling.  But very simply

25 it's ongoing and continued gambling despite adverse

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com            6

FONG - DIRECT

1  consequences.  Pathological gambling is a brain disease and
2  our work and a lot of our work in our field has shown that
3  it's no different than other medical illnesses like diabetes,
4  cancer, asthma.  There are biological, psychological, and
5  social reasons and causes, if you will, as to why that
6  behavior happens.  Over the last 15, 20 years we've been able
7  to determine genetic components of gambling addiction,
8  biological components of gambling addiction, and really map
9  out the course of the illness of the behavior.
10 Q    Could you elaborate a bit more on the biological aspect
11 of the pathology?
12 A    Sure.  So in terms of pathological gambling, in terms of
13 the biology what we know is that inside the brain there's
14 certain regions of the brain of pathological gamblers that,
15 for lack of a better word, are not functioning as they should
16 be.  These are regions that control behavior.  The front part
17 of our brain or the brakes in our brain if you will are
18 essentially broken or dysfunctional.  Couple that with a --
19 the parts of our brain that determine urges, cravings,
20 impulses to do certain things.  So very simply the way we
21 describe it neurobiologically with a gambling addiction that
22 the brakes are broken and the gas on the pedal to seek out
23 that behavior is also broken.  So you put those two
24 biological processes together, drive, pathological drive, an
25 urge to seek out gambling coupled with the loss of control

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    7

FONG - DIRECT

1  over the gambling behavior creates the situation of gambling

2  addiction.

3  Q    Is the brain of a pathological gambler different from

4  the brain from someone who does not have such a pathology?

5  A    Well, what we know is that the brain is structurally

6  and functionally different.  It's not to the, quote, "naked

7  eye," where if you were to do a biopsy or look inside it you

8  would see a region of the brains that are missing or damaged

9  or scared over.  But we now know through neuro-imaging work

10 that we can tell and through some other neurochemical work,

11 that we can tell that the brain is physiologically different.

12 Different ways of reacting to neurochemical, different levels

13 of neurochemical, and all of this is steeped in biology and

14 science.  It's not steeped in will or morality or willpower.

15 It's how a person's brain is made and it's how a person's

16 brain becomes after years of gambling.  For instance, we know

17 that drug and alcohol addiction causes brain damage to the

18 brain.  You know, people take drugs, drugs damage the brain.

19 We've done research to show that brains of pathological

20 gamblers are impaired, areas of memory, attention.

21 Performance areas that you would not expect to be damaged but

22 actually are and even though there are no drugs or abuse that

23 the person has been exposed to.

24 Q    Now I want to discuss specifically your observations and

25 evaluations of Monsignor McAuliffe.  How does the other two

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    8

FONG - DIRECT

1  disorders that you describe factor into the gambling

2  addiction that he has?

3  A    Well, in my opinion and based on my clinical experience,

4  pathological gambling oftentimes coexists with other

5  psychiatric disorders, like depression, anxiety, bipolar

6  disorder.  What happens very simply is that when people are

7  struggling with these diseases they have impaired feelings

8  and mood states, feelings of low mood, feelings of impaired

9  self-esteem, feelings of anxiety, insomnia, impaired

10  concentrations.  And oftentimes as people go throughout

11  their daily lives feeling that way they turn to certain

12  things to try and cope with that.  With some people it's

13  drugs, others it's alcohol, some people it's work.  If I

14  recall his case, I saw that gambling served as a self-

15  medication, of you will to help manage feelings of depression

16  and anxiety, feelings of inadequacy and self-esteem and

17  feelings of perfectionism that couldn't quite be achieved.

18  So the gambling became a way of coping with stress, coping

19  with anxiety, coping with feelings of depression, and

20  sadness.

21  Q    Okay.  Could you explain to us, as I understand it part

22  of the diagnosis of gambling addiction may involve the

23  commission of crimes, could you please elaborate on that

24  component of the diagnoses or the criteria I should say of

25  gambling addiction?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                9

FONG - DIRECT

1  A    Okay.  So to diagnosis with someone with pathological

2  gambling we have 10 scientifically validated criteria that

3  we apply to say whether or not they actually met that

4  criteria or not.  Father McAuliffe's case, he met 10 out of

5  the 10 criteria.  One of the criteria is a criteria related

6  to crime where it states very clearly that the patient will

7  have committed crimes in order to finance ongoing gambling

8  behaviors.  So when we look at clinical populations of

9  pathological gamblers, we know that about 25 to 30 percent of

10 all gamblers at some point during their gambling addiction

11 will commit a crime to finance their gambling.  What that

12 crime is really depends.  Sometimes it's stealing.  Sometimes

13 it's insurance fraud.  Sometimes it's robbery.  Sometime it's

14 selling, you know, drugs to get money.  Sometimes it's

15 prostitution.  But it's very common in the condition of

16 gambling addiction for crimes to occur during the course of

17 the disease.  It's the only diagnosis -- it's the only

18 psychiatric diagnosis that I'm aware of where the actual

19 symptom of the disease is criminal offense.

20 Q    Did you have the opportunity to read the PSI as well as

21 the sentencing memorandums in this case?

22 A    I did.

23 Q    I want to address a few issues out that in light of what

24 you've just explained to us.  This is $650,000 that was taken

25 from the church.  This is church money.  How is it this --

2:11-CR-0365-JCM-RJJ    U.S. v. McAuliffe    1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com          10

FONG - DIRECT

1  that this man, who's very intelligent, how is it that he just

2  couldn't stop it?  Why did this go on for so long?

3  A    So there's several opinions I have on that question.

4  And number one, pathological gambling is a hidden addiction.

5  It's unlike drugs and alcohol where you can see it, you can

6  smell it, you get a sense if something's not right.  So I've

7  had patients show up into my office that came straight from

8  the casino and I had no idea.  So the signs and symptoms of

9  gambling addiction are hidden away.  You don't see it.  You

10 can't detect it.  No one, quote, "overdoses" at a point where

11 they end up in the emergency room.  So with that mind, I

12 think it's very -- it is very common for the signs and

13 symptom to go on for years.  We know that for instance from

14 the time people start having problems controlling their

15 gambling to the time that they present to treatment, on

16 average is about 10 to 12 years.  You think about that from

17 other medical illness.  From the time you develop chest pain

18 to the time you see your doctor to evaluate for heart

19 disease, it's not 10 years.  It's much less.  It's a matter

20 of weeks.  So that's number one.

21     Number two, I look at the total amount of the amount of

22 the offense of $650,000 and I think about how can that

23 happen?  In our treatment clinic we have a wide range of

24 folks who've stolen upwards of 40, 50, 60,000.  And the

25 largest amount I've had is someone who stole over 12 million

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    11

FONG - DIRECT

1  dollars in the course of his gambling addiction.  This

2  particular situation, why I believe criminal offense happens,

3  it has to do with, number one, untreated gambling addiction

4  signs and symptoms.  The urge to gambling, coupled with the

5  loss of control and coupled with an opportunity to -- the

6  constant opportunity of cash being available.

7      A lot of my patients don't have cash that's in front of

8  them.  They have to borrow against their credit card.  They

9  have to write bad checks.  They have to rob from somebody at

10 gunpoint.  But if they were given the opportunity to have

11 cash right in front, oftentimes the signs and symptoms are of

12 the disease, the urges, the compulsion, the loss of control

13 will overwhelm the other parts of the brain functioning that

14 says, no, you shouldn't do this.  So the way I was thinking

15 about this is that if I said to anyone in this room don't

16 fall asleep for the next seven days, and if you fall asleep

17 you're breaking the law.  We know that none of us would be

18 able to manage that because these are natural biological

19 processes that we can't fight off.  That's how gaming

20 addiction is, is the urges, the compulsions coupled with the

21 loss of control people can't fight off.  They can't shake it.

22 As much as they want to, as much as they say this is wrong,

23 as much as they say, I don't want to gamble because I don't

24 even enjoy it, the compulsion, the urge is there.

25 Q    Why did he stop or can you render an opinion I should

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    12

FONG - DIRECT

1  ask as to why he stopped when the FBI confronted him in May

2  of 2011?

3  A    You know, this is actually a very interesting point and

4  you see this a lot, is that as patients are going through the

5  course of their gambling addiction they try and stop on their

6  own, it doesn't work.  They try and say this is it, this is

7  the last bet I'm going to make for a month or two months, and

8  they can't.  And that's the actual disease symptoms again.

9      Oftentimes that's why interventions make sense.  When

10 family members step up, when friends step up and say, you

11 know what, what you're doing, we're concerned about your

12 behavior, you need help.  Oftentimes that's enough to get

13 people to stop.

14         Throughout my clinical experience I've had a lot

15 of patients from the first appointment that they see me,

16 they've never gone back to gambling again.  So this is a

17 disease where, although it is a chronic relapsing disease,

18 that many times it's not until people are faced with, kind of

19 a crisis situation or a watershed moment or you can call it

20 the tipping point in their lives where the motivation far now

21 exceeds the symptoms of their actual disease.  So I've seen

22 this time and time again where patients have struggled for a

23 long time trying to manage it themselves.  But when an

24 external force is placed upon them, family member, the

25 secret's out, or in this case the -- the very real situation

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com              13

                        FONG - DIRECT

1   of federal prosecution, that oftentimes is able to keep

2   people's behaviors in check for a short period of time.

3   Q    What is Father McAuliffe's prognosis in your opinion?

4   A    So the way to first define prognosis is what is the

5   likelihood of this condition returning or worsening or

6   getting better?  So at this time the way I -- my opinion is

7   that with ongoing treatment and monitoring and support, three

8   very important things, I believe Father McAuliffe's prognosis

9   will be good.  In the sense that the likelihood of return to

10  gambling or the likelihood to return to gambling addiction

11  would be low.  If I had to put a percentage on that, it would

12  just be a guess.  But the way we think about it is the other

13  way.  If people stay in treatment -- this is from our

14  scientific studies, the longer people stay involved in

15  treatment the less likely they will return to gambling.  So

16  much of the prognosis is really based on the ability to

17  participate in treatment, participate in recovery activities

18  that will determine whether or not gambling addiction will

19  return.

20  Q    And what treatment would you recommend for Father

21  McAuliffe?

22  A    So for specifically for Father McAuliffe I would

23  recommend ongoing first 12-step support from Gambler's

24  Anonymous.  I would recommend individual psychotherapy with a

25  professional who has gambling treatment experience.

FONG - DIRECT

1  Unfortunately, one of the things in the mental health field

2  is that a lot of therapists don't have any experience with

3  gambling addiction and it would be like me trying to do

4  surgery on somebody.  It's just not going to work well.  Then

5  I would recommend what we call ongoing monitoring.  Now in

6  gambling addiction there is no urine drug screen to tell

7  whether someone has been gambling recently or not.  So

8  instead what we do in our treatment program is we recommend

9  what we call peer support or surprise visits, if you will.

10 That's someone from the treatment team to go in and look at

11 the home, look at the financial records, look at how one is

12 spending their time to determine whether or not quality of

13 life and recovery activities are really taking hold.

14      And then lastly I would strongly recommend that Father

15 McAuliffe be monitored and treat -- monitored along by an

16 addiction psychiatrist, someone with expertise in handling of

17 addictions as well as possibly for medication to help restore

18 and maintain recovery in a healthy way.

19 Q    Do you know whether or not those services are available

20 in the federal prison system?

21 A    Based on my experiences, those services are not

22 available in federal prison, particularly to highly

23 specialized knowledge of how to treat gambling addiction.

24          MS. STANISH:  That's all the questions I have.

25 Doctor, is there anything you believe Judge Mahan should know

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com          15

FONG - DIRECT

1   that I have not covered with you?

2        THE WITNESS:  I think a couple key points I would

3   really emphasize in addition to gambling addiction being a

4   brain disease is that the -- when I first took on this case

5   and look at from, you know, objective standpoint the first

6   thing that really struck [sic] to me was just the level of

7   the offense, the shear number and the length of time.  And

8   then after sitting down, reviewing the record, and talking to

9   Father McAuliffe, it made sense to me that this was, again,

10  very similar to what we see all the time in our treatment

11  program and clinics.  A case of an addiction that goes a long

12  time without the signs and symptoms of being seen.  A case

13  where interventions are not brought on by people around, but

14  even more so the shame and stigma of having gambling

15  addiction in of itself.  So a lot of time patients say to me

16  the hardest thing for me was to go say I have a problem and

17  tell someone.  This isn't like cancer.  This isn't like heart

18  disease.  This isn't like diabetes where you can tell a

19  family member or friend.  This is addiction.

20        I think coupled with the position that Father

21  McAuliffe was in, being a leader in the community, I think

22  that made the stigma much, much more harder.  I think that in

23  our -- and I know that our clinical experience when we work

24  with doctors, lawyers, CEOs, people in positions of wealth

25  and resources and leadership, the stigma approaching asking

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com              16

FONG - CROSS

1   for help for a disease like addiction, gambling addiction is

2   much, much higher.  But that's also not surprising to me why

3   help wasn't sought.  Because very often professionals like

4   yourselves, doctors, when we're impaired we're the worst

5   patients.  We're the ones that don't seek out help or reach

6   out for help.  And so I think that was a theme that I picked

7   up was why he didn't seek out help sooner and those were the

8   reasons I would highlighted.

9           MS. STANISH:  Thank you, sir.

10          THE COURT:  All right.  Thank you.

11          Ms. Brown, cross-examination.

12          MS. BROWN:  Thank you.

13                    **CROSS-EXAMINATION**

14  BY MS. BROWN:

15  Q    Good morning, Dr. Fong.  How are you?

16  A    I'm good, thank you.

17  Q    Would you agree that when making a psychiatric diagnosis

18  it's helpful to have as much information as you possibly can

19  about the person?

20  A    Correct.

21  Q    And it's important to have reliable information?

22  A    Sorry, I didn't hear?

23  Q    It's important to have reliable information, not only as

24  much information as you can but reliable information?

25  A    Correct.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    17

FONG - CROSS

1   Q    And in dealing with someone who potentially has mental

2   health issues that individual himself or herself may not be

3   the most reliable source of information?

4   A    Correct.

5   Q    So that's why in many instances you might want to seek

6   out information from other sources, other records, other

7   individuals that may know that person, correct?

8   A    Correct.

9   Q    But in that case -- in this case I should say you did

10  not do that or you did not have the opportunity to do that,

11  is that correct?

12  A    I reviewed the treatment documents from Robert Hunter's

13  treatment program but I did not interview anyone else who

14  knew Father McAuliffe other than counsel.

15  Q    Correct.  So you interviewed -- to be clear, you

16  interviewed [sic] the presentence investigation report that

17  was prepared by probation, correct?

18  A    Correct.

19  Q    You interviewed [sic] the plea agreements --

20  A    Correct.

21  Q    -- that was filed in this case, and you interviewed [sic]

22  the treatment records from the Problem Gambling Center,

23  correct?

24  A    Correct.

25  Q    And those records consisted of two documents, I believe

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    18

FONG - CROSS

1  that were essentially applications or the information forms

2  that are filed out when Mr. McAuliffe went for treatment on

3  June 20th, and they were filed out by himself, it contains

4  his address and his information.  Do you recall that?

5  A    Yeah, I recall that.  Yes.

6  Q    Okay.  And it contains his individual therapy notes, his

7  session notes filled out by Linda Creel [phonetic], his

8  therapist?

9  A    Correct.

10  Q    Correct?

11  A    Correct.

12  Q    From about -- I believe it was July through November --

13  July, August through November, does that sound accurate?

14  A    Yeah.  Correct.

15  Q    And it also contained group therapy session notes filled

16  out by an individual most of the time named Gordie, correct?

17  A    Correct.

18  Q    Okay.  And that -- those are the documents that you

19  reviewed?

20  A    Yes.

21  Q    So the information that's contained in those records is

22  information that's provided by the defendant, by Mr.

23  McAuliffe, right?

24  A    Correct.

25  Q    He's the person reporting?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    19

FONG - CROSS

1   A    Okay.

2   Q    Okay.  So once again the information that you have from

3   all the records and from meeting with Mr. McAuliffe is all

4   self-reporting information?

5   A    Correct.

6   Q    Perhaps sometimes filtered through the eyes and ears of

7   the therapist but otherwise himself.  Okay.  You did not have

8   any of his medical records to review?

9   A    Can you define medical records?

10  Q    Apart from the Gambling Problem Center, you didn't have

11  any medical records, is --

12  A    No, I did not.

13  Q    Okay.  Any work records?

14  A    No.

15  Q    All right.  And I don't want to belabor the point but

16  you didn't talk to any supervisors, co-workers, any of those

17  individuals who might have known Father McAuliffe or Mr.

18  McAuliffe over time?

19  A    No.

20  Q    You knew that he lived with an individual for a number

21  of years, Father Vivona?

22  A    Yes.

23  Q    And you didn't speak to him?

24  A    No.

25  Q    All right.  Did you speak to his attorney though?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    20

FONG - CROSS

1   A    Yes.

2   Q    All right.  How many times did you talk to her?

3   A    Approximately maybe a dozen times over the phone.

4   Q    A dozen times?

5   A    Yeah.

6   Q    All right.  And you weren't provided any of the

7   discovery or any documents in this case, is that right?

8   A    Can you -- no, not like the arrest report or things like

9   that.  No.  No.

10  Q    Any of the information pertaining to the charges or the

11  statements with the -- that Mr. McAuliffe made as the

12  investigation was going on, any of -- any of those types of

13  documents, right?

14  A    I'm not aware of those formal documents, no.

15  Q    And you didn't speak with his sister who -- I believe

16  they've been estranged since 2006, but she's had a

17  relationship with him all his life, right?

18  A    Correct.  I did not speak with her.

19  Q    All right.  Now how is it that you came be involved in

20  this case?  Who reached out to you or you to them initially?

21  A    I received an email from Margaret Stanish basically

22  stating that she was looking for an expert opinion in this

23  case and I responded to that email and called her.  We talked

24  about the particulars.

25  Q    And may I assume there's a fee arrangement?

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com          21

FONG - CROSS

1   A    Correct.

2   Q    And can you just tell the Court what that is?

3   A    So my traditional standard fee is $400 an hour for

4   expert-related matters.  For this particular case I reduced

5   that fee to $250 per hour.

6   Q    And is that in court or out of court?

7   A    All of it.  For any hour that I work related to this

8   case I'll charge $250.

9   Q    And does that include phone consultation?

10  A    It does, but I didn't keep track of all the phone calls

11  on a ledger or anything so I just put a general number to the

12  phone calls.

13  Q    And travel time?

14  A    And travel time.  For instance, a full day like today

15  I'll say it's an eight-hour day and that's inclusive of

16  travel time and just charge 250 an hour for the eight hours.

17  Q    So can you give just a rough approximation of the hours

18  that you have into this case?

19  A    Approximately -- including today?

20  Q    Yes.

21  A    I would say it would be about -- closer to 30 hours

22  total.

23  Q    Now you've stipulated to your -- your training and

24  experience in gambling addiction but I did want to ask, have

25  you ever testified as an expert in Federal Court pertaining

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
                                                         **Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    22

FONG - CROSS

1   to gambling addiction --

2   A    I have.

3   Q    -- in a criminal case?

4   A    I have, yes.

5   Q    And how many times is that?

6   A    At least once.  There may have been some other federal

7   cases that I can't recall off the top of my head because, you

8   know, all the courtrooms look the same to me.  But I can

9   certainly recall once -- actually now that I've been talking

10  I can recall two clear times in Federal Court that they

11  related to gambling addictions.

12  Q    In a criminal case?

13  A    I can name -- yeah.  Yes, correct.

14  Q    In a criminal case.  And how long ago was that?

15  A    The first case was 2004 and the second case was in 2009.

16  Q    2009.

17  A    Yeah.

18  Q    And were you testifying for the -- for the prosecution

19  or for the defense?

20  A    For the defense on both cases.

21  Q    And speaking to your prior testimony in criminal cases

22  as it relates to gambling addiction, have you ever testified

23  for the prosecution or have you always testified for the

24  defense?

25  A    I have always testified for the defense but I've never

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    23

FONG - CROSS

1  been asked to testify by the prosecution.

2  Q    All right.  I'd like to speak now to something you said

3  a little bit earlier and talk a bit more about the

4  information that you relied on in coming to the diagnosis

5  that you did.  You talked earlier about compulsive gambling

6  or pathological gambling being a brain disease.  So you

7  stated that you didn't obtain any medical records of the

8  defendant and you were talking about the biology of the

9  brain being different for pathological gamblers and so is

10  that something -- it sounded as though it was, that

11  neurologically the brain is different for pathological

12  gamblers.  So it is a measurable objective test that can be

13  performed in order to see whether someone may have a

14  pathological gambling issue, is that accurate?  Is that what

15  you were saying?

16  A    I would say it's mostly accurate.  You know, we wish we

17  had standard reliable medical tests for all mental illnesses,

18  like we do for say heart disease or diabetes or high blood

19  pressure, but we don't.  The reasons we know that there are

20  these biological changes come through scientific research,

21  where we can take, for instance, a group of patients we know

22  to have this condition of gambling addiction compared to a

23  group of folks who don't have it, and look at differences

24  biologically through blood tests or through brain scan,

25  neuro-imaging and things like that.  But when it comes to the

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    24

FONG - CROSS

1   clinical setting the technology is not yet there for us to

2   demonstrate that, you know, like in Star Trek, you know, you

3   can just do a quick scan and say, this is someone who has a

4   diagnosis.  We don't have any blood tests, we don't have any,

5   you know, DNA tests or anything like that that we can use to

6   definitively diagnose someone with that specific disorder.

7   Q    So if it's not available in a clinical setting, in what

8   setting has that research been performed?

9   A    Primarily only in the research setting so -- and the

10  research settings are highly controlled scientific

11  experiments done in the lab or under very controlled

12  circumstances so you know exactly what's happening between

13  different groups that you're studying.

14  Q    And those are published peer reviewed research?

15  A    Yes, absolutely.  So -- and then as the research occurs

16  then you take your scientific findings, you submit it to a

17  journal, and it'll be published in a peer reviewed research,

18  which then adds to the knowledge base of how diseases are

19  occurring and what causes them.

20  Q    All right.  But there are other objective tests.  We've

21  already talked about how all the information, at least so

22  far that was relied on by you, was subjective.  In other

23  words, self-reported by the defendant.  There are tests that

24  are available, such as the MMPI that have, in laymen terms,

25  what's known as sort of built in lie detectors and you can

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    25

FONG - CROSS

1    get a great deal of information from those types of tests,

2    would you agree with that?

3    A    Some of them.  Like for instance MMPI is a personality

4    inventory, it's not so much to diagnose clinical conditions.

5    For things like pathological gambling we have structured

6    interviews and we have validated questionnaires that we know

7    are -- that we can use.  But then there's also the clinical

8    experience test that we use where in the 12 years I've been

9    working with gamblers there are times when someone comes in

10   and they can clearly tell that their signs and symptoms are

11   made up.  That they're --

12   Q    But that's totally subjective, isn't it, Doctor?  That's

13   just you and the patient having a conversation, in your

14   opinion that he or she suffers from depression or social

15   anxiety, there's no objective measurement as measured

16   against other individuals, that that's true or not true,

17   correct?

18   A    Correct.  And that's true for all of our mental

19   illnesses.  There's not a single mental illness except --

20   with the exception of perhaps mental retardation.

21   Everything -- you use an objective test to determine that

22   this person does or does not, quote, "have that illness."

23   Q    Well, that may be true but isn't it also true that for

24   example the MMPI which is widely administered measures such

25   things as depression, hysteria, psychopathic deviate scale,

2:11-CR-0365-JCM-RJJ       U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                26

FONG - CROSS

1   mania, social introversion, and other measures that can

2   inform a therapist about such issues such as you diagnosed

3   the defendant with?

4   A    That's correct and that all falls under the term of

5   neuropsychological testing to -- and MMPI is certainly one

6   of those test instruments that can be used.  And again, it

7   isn't so much for diagnosis as it for identifying signs and

8   symptoms of particular areas of pathology that could then

9   lead the clinician or the examiner to then prob for more

10  symptoms and  -- that would fit the mold of the -- of

11  disease.  So it is, it's a wonderful tool, it's a wonderful

12  test to be used.

13  Q    And so all I'm asking is that that was not administered

14  either by you or by Dr. Hunter?

15  A    It wasn't administered by myself.  I'm not trained in

16  doing that.  I don't know if Dr. Hunter did or did not.

17  Q    But in his -- in your review of the Problem Gambling

18  Center records there was no reference to any objective test

19  being administered, is that true?

20  A    There is no reference to --

21  Q    Other than the DSM test and the South Oaks Gambling

22  Screening Test?

23  A    Correct.  Correct.

24  Q    Which I'll get to in a moment.  Okay.

25  A    Correct.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    27

FONG - CROSS

1  Q    Now you met with the defendant the one time, correct?

2  A    Yes.

3  Q    And you met with him for 2.5 hours?

4  A    Correct.

5  Q    Now was that 2.5 hours actual discussion time or did

6  that include filling out paperwork?

7  A    No, that was all pretty much face-to-fact interview

8  time.

9  Q    And so the meeting, to be clear, was after he had

10 pleaded guilty and was awaiting sentencing here today?

11 A    Correct.

12 Q    In fact, it was -- I believe it was -- was it last month

13 or in November that you met with him?

14 A    I don't have the actual date off the top of my head

15 but --

16 Q    Early December, perhaps?

17 A    -- it was -- I think it was --

18 Q    December 2nd, does that sound correct?

19 A    That sounds correct, yes.

20 Q    All right.  And were just the two of you there at that

21 meeting?

22 A    Yes.

23 Q    And after that meeting you created a report that was to

24 be provided as a summary of your meeting, correct?

25 A    Correct.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    28

FONG - CROSS

1  Q     And your diagnosis and your prognosis?

2  A     Correct.

3  Q     Thank you.  Is this report that you created the first

4  and only report that you created?

5  A     Yes.

6  Q     There were no other drafts of it?

7  A     What date do you have on that one?

8  Q     I have a date of December 28, 2011.

9  A     Yeah.  I mean there were drafts that I created and then

10 depend if I -- once I got additional records to put

11 additional facts in there and then saved over the same

12 version of that --

13 Q     What did -- what additional records?

14 A     I think it was the presentencing.  There was an updated

15 presentencing memorandum that came right before that if I

16 recall.

17 Q     Did you make any revisions based on anything other than

18 review of the PSR?

19 A     No, it was just a little bit tightening up the details,

20 ensuring the accuracy of some of the details.

21 Q     Now, I noticed in your report that it indicated on

22 page 7 -- and I don't know if you have access to that, that

23 -- well, let me as you first if you can agree with this

24 statement.  Here in Las Vegas we have a lot of tournaments,

25 we have professional poker players so would you agree that

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    29

FONG - CROSS

1   not everyone who gambles a lot is necessarily a pathological

2   gambler?

3   A    Correct.

4   Q    Okay.  And some of those people who gamble a lot may

5   even play video poker?  There are tournaments for that, are

6   you aware of that?

7   A    Yes.  Mm-hmm.

8   Q    Okay.  So just because someone gambles a lot doesn't

9   necessarily mean they're going to fit the criteria as a

10  pathological gambler, correct?

11  A    Correct.

12  Q    All right.  Now your report on page 7 indicates that a

13  questionnaire was administered and that's the NODS Gambling

14  Screen.  Is that the same thing as the DSMV-IV 10-question

15  test that's administered to determine if someone meets the

16  criteria?

17  A    Yes, it is.

18  Q    Okay.  And you also testified previously that you relied

19  on the records from, again, The Problem Gambling Center,

20  correct?

21  A    Correct.

22  Q    Okay.  And I know I'm skipping around just a little bit,

23  but you reviewed the PSR you said?

24  A    Yes.

25  Q    And in the PSR is a statement by Dr. Robert Hunter, who

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                                          30

FONG - CROSS

1  again is -- directs The Problem Gambling Center, and in that

2  he states that there's no possible doubt in his mind that Mr.

3  McAuliffe is a pathological gambler, correct?

4  A    Correct.

5  Q    No possible doubt in his mind.  And he bases that on

6  administration of the test, the DSMV-IV TR Test, and says

7  that Mr. McAuliffe got 10 out of 10 positives on that test,

8  correct?

9  A    Correct.

10  Q    And that's contained in these records, the results of

11  that test are contained in these records, correct, that you

12  reviewed?

13  A    Yes.

14  Q    Okay.  And he also says that -- well, let me start with

15  that first.  So you reviewed these, correct?

16  A    Correct.

17  Q    All right.

18          MS. BROWN:  Your Honor, may I approach.

19          THE COURT:  Yes, ma'am.

20  BY MS. BROWN:

21  Q    I'm going to hand you what's been marked for

22  identification as Government Exhibit Number 1, which is the

23  South Oak Gambling Screening, correct?

24  A    Correct.

25  Q    And back a few pages is the DSMV 10-question?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    31

FONG - CROSS

1   A    Correct.

2   Q    Correct?  Okay.  And you're following that?

3   A    Sure.

4   Q    Now looking at the DSMV-IV test, the 10 questions, Dr.

5   Hunter said that Mr. McAuliffe got 10 out of 10 questions,

6   answered those affirmatively.  Is that true?

7   A    I'm sorry, say that again?

8   Q    Dr. Hunter said that when Mr. McAuliffe answered the

9   questions on the DSMV questionnaire he answered 10 out of 10

10  questions affirmatively?

11  A    Correct.

12  Q    Is that true?

13  A    Based on Dr. Hunter's that was -- that was his opinion,

14  yes.

15  Q    It's not an opinion, Dr. Fong, the test is right in

16  front of you.  I'm asking you, did he answer 10 out of 10

17  questions affirmatively or not?

18  A    Well, on this questionnaire, no, he answers five out of

19  10.

20  Q    In our -- is this test from The Problem Gambling Center

21  records?

22  A    So the way I -- opinion on this --

23  Q    It's a yes or no.

24  A    Yes, this is five out of 10.

25  Q    And this record, this test is from The Problem Gambling

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com          32

FONG - CROSS

1  Center records that you were provided by Ms. Stanish,

2  correct?

3  A    Correct.

4  Q    So he didn't get 10 out of 10, he got five out of 10?

5  A    I don't know what Dr. Hunter based his 10 out of 10 on,

6  from -- I don't know if he based it out of -- this particular

7  questionnaire or if he administered something else.

8  Q    Well, okay.  And I don't mean to argue with you, but

9  again, this is the DSMV for 10-question questionnaire that is

10 in The Problem Gambling Center records?

11 A    Correct.

12 Q    And there's no other questionnaire contained in The

13 Problem Gambling Center records that you were provided that

14 shows 10 out of 10, is there?

15 A    No.

16 Q    Okay.  So then going also to Dr. Hunter's report he also

17 says, and I have it if you need to see it --

18 A    Okay.

19 Q    -- to refresh your memory.  He said in the PSR letter

20 that -- let me find it.  That Mr. McAuliffe scores at the

21 very top of the South Oak Gambling Screen, a formal

22 psychological test for this disorder referencing gambling

23 addiction, correct?

24 A    Correct.

25 Q    Okay.  So if you turn to the first page of the exhibit

FONG - CROSS

1  is the South Oak Gambling Screen and you can see that Mr.

2  McAuliffe's name is there, the date on that is 6/20, 2011,

3  correct?

4  A    Correct.

5  Q    And in flipping through there if you go to the score

6  sheet, and you're familiar with this test, are you not?

7  A    Yes.

8  Q    How many -- what was the score on this?

9  A    So on the score sheet here there's a blank on the total

10  points --

11  Q    Mm-hmm.  But you can add it up, correct?

12  A    Yeah.  Absolutely.  One, two, three, four, five, six,

13  seven -- a total score of seven.

14  Q    And what's the maximum score on this test?

15  A    Twenty.

16  Q    So he got a 20 out of seven [sic].  Would you, in your

17  opinion say that a seven out of 20 is at the very top of the

18  South Oaks Gambling Screen?

19  A    No, I would not.

20  Q    Thank you.

21         MS. BROWN:  Your Honor, I would like to admit that

22  exhibit.

23         THE COURT:  Any objection?

24         MS. STANISH:  I'm sorry, I didn't hear her.

25         THE COURT:  She wants to admit the exhibit, Exhibit

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
                                                           **Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                        34

FONG - CROSS

1. 1.

2.          MS. STANISH:  Yeah.  No objection.

3.          THE COURT:  All right.  The same will be admitted.

4. Thank you.

5.                    (Plaintiff's Exhibit 1 admitted)

6. BY MS. BROWN:

7. Q    Now in order to qualify as a -- the borderline between

8. pathological gambler and not a pathological gambler, for

9. example on the DSM-IV test that had the 10 questions, if he'd

10. scored a four rather than a five you wouldn't have diagnosed

11. him as a pathological gambler, would you?

12. A    Well, technically no, but technically, yes.  So the way

13. I would explain that is when the DSM-IV is written they

14. approached it as a categorical statement, so if you had five

15. or more you, quote, "had it."  But research since then had

16. now indicated that even if you have one, two, three or four

17. criteria out of 10 you do meet criteria for a sub -- another

18. kind of gambling addiction we call problem gambling or a

19. lesser form of it.  But it's still a significant clinical

20. issue.  But it used to be and that's how I learned it when I

21. was in residency was that if you had one or two criteria out

22. of 10 you didn't, quote, "have a gambling addiction."  But

23. research since then has now indicated that you do still have

24. a form of gambling addiction it's just not as severe as the

25. diagnosable one.

2:11-CR-0365-JCM-RJJ       U.S. v. McAuliffe        1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    35

FONG - CROSS

1  Q     Let me put this way, five is on the margin?

2  A     Five is not on the margin.  Five is a --

3  Q     Five -- to diagnosis someone as a pathological gambler

4  they have to have a score of five or more, correct?

5  A     Correct.

6  Q     And to diagnosis someone as a pathological gambler for

7  the South Oaks Screening test they have to have a score of

8  five or more, correct?

9  A     Correct.

10 Q     Okay.  So -- all right.  Thank you.  Now another thing

11 that I noticed in looking at The Problem Gambling Center

12 records, in filing out the application is that the defendant

13 presented to The Problem Gambling Center with two issues.  He

14 presented with not only gambling but he also presented with a

15 problem with spending.  And this was in his own words and I

16 have this if it would -- if you need to see it to refresh

17 your recollection.  But again, you did review these records.

18 And he -- what he wrote was that he had a problem with

19 spending, that he buys too much of something or things not

20 needed.  Do you remember that?

21 A     I do remember, yes.

22 Q     And now you're aware, through your review of the PSR,

23 that the defendant reimbursed himself from the church for

24 personal expenditures like plane tickets and things like

25 that, right?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                        36

FONG - CROSS

1  A    Correct.

2  Q    But that's not the same, would you agree, as a

3  compulsive spender?  Someone who buys too much of things or

4  things that are not needed?

5  A    Correct.

6  Q    How is that accounted for in your diagnosis of

7  compulsive gambling?

8  A    Well, compulsive shopping or compulsive spending is

9  another separate behavioral addiction.

10  Q    So it's not?

11  A    It's not.

12  Q    All right.

13  A    Yeah.

14  Q    And nowhere in his letter to the Court does Dr. Hunter

15  mention anything about compulsive spending, does he?

16  A    I don't recall it in the letter, no.

17  Q    Now in reviewing the individual counseling session notes

18  compulsive spending isn't mentioned as something that's being

19  addressed in those either is it?

20  A    No.

21  Q    And as a matter of fact in reviewing the individual

22  counseling session notes something that stood out to me is

23  that it doesn't appear that treatment for gambling addiction

24  is something that's being addressed in counseling.  Do you

25  recall that?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    37

FONG - CROSS

1  A     No, can you expand on that?  I'm not sure I understand

2  that point --

3  Q     In reviewing -- you reviewed in order to make your

4  diagnosis, your prognosis, your treatment recommendation, and

5  so forth reviewed, I assume, the individual counseling

6  session notes from The Problem Gambling Center, correct?

7  A     Correct.

8  Q     And in doing that it would have been important to know

9  what was discussed in therapy, correct?

10  A     Correct.

11  Q     And did you notice whether in these treatment session

12  notes Mr. McAuliffe ever discussed gambling addiction with

13  his therapist?

14  A     Do you have a specific session or a specific note that

15  you would like me to opine on?

16          MS. BROWN:  Judge, may I approach the witness?

17          THE COURT:  I'm sorry?

18          MS. BROWN:  May I approach the witness?

19          THE COURT:  Yes, ma'am.  Yes, ma'am.

20              (Off-record colloquy of Counsel)

21          THE WITNESS:  Okay.

22  BY MS. BROWN:

23  Q     Do you see --

24  A     Okay.  So --

25  Q     -- do you see any reference in those notes that during

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    38

FONG - CROSS

1   his individual therapy session at The Problem Gambling

2   Center Mr. McAuliffe was getting treatment for gambling

3   addiction?

4   A    Well, when I look at these notes these are fairly

5   typical treatment notes that happen during the course of

6   sessions documenting what was talked about, documenting, you

7   know, what's on the mind of the patient.

8          THE COURT:  Listen to her question and answer the

9   questions.

10  BY MS. BROWN:

11  Q    Do you see -- do you need me to repeat it?

12  A    Yeah.  I mean it's a little confusing to me.  Yeah.  But

13  please do.

14  Q    When you look through the individual treatment session

15  notes do you see reference in there to the therapist, who's

16  making the notes, having discussion about gambling addiction

17  or treatment for gambling addiction?

18  A    Well, I see treatment for gambling addiction in these

19  notes.

20  Q    Where do you see that?

21  A    I see them just based on the documentation of the

22  therapist describing what was talked about or what --

23  Q    And --

24  A    -- the symptoms that the person was discussing.

25  Q    Isn't it true, Dr. Fong, that each and every single

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    39

                              FONG - CROSS

1    individual therapy session the defendant is focused on his

2    sentencing and his legal proceedings?

3    A    I'll say yes; that's true.  Yeah.

4    Q    And can you point to me anywhere in the records where

5    gambling addiction or talking about gambling treatment is

6    referenced in any one of those session notes?

7    A    "September 27th, is working his program plus the three

8    GA meetings a week.  Is grateful for ongoing therapy at the

9    PGC."  So to me that --

10   Q    Okay.  That's talking about him getting treatment

11   somewhere else.  Does it show that he's working with his

12   therapist to get gambling treatment?

13   A    Working on staying in the moment, volunteering more to

14   get out of self-fear.  So to me that evidence of gambling

15   treatment or treatment for gambling addiction.

16   Q    Okay.  Anything else?

17   A    "Client working on staying in today's moment."  That's a

18   statement where "Client working on willingness to change, out

19   of denial, connecting with his group."  These are clinical

20   terms to me that indicate that he's working on gambling

21   addiction treatment.

22   Q    Okay.  Is that it?

23   A    "Kevin asks to stay in group a few more weeks," which is

24   a note from the therapist indicating that he needs to stay

25   involved in treatment there.  Okay.

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
                                                              **Testimony of Dr. Fong**
                 NW TRANSCRIPTS, LLC - Nevada Division
                              P.O. Box 890
                         Nampa, Idaho 83653-0890
                  (208) 989-3455 - gayle@nwtranscripts.com                    40

FONG - CROSS

1  Q    But would you also agree that the majority of the notes

2  are -- reflect a consumption with his legal issues and his

3  impending court issues?

4  A    Absolutely.  Yes, I would agree with that.

5  Q    All right.  Thank you.

6         THE COURT:  Do you want to make that an exhibit,

7  the interview notes?

8         MS. BROWN:  Yes.  Let me mark those in.

9         THE COURT:  Are -- they use them to refresh his

10  recollection so it should be marked.  It'll be Exhibit 2.

11  BY MS. BROWN:

12  Q    Now, I'd like to move on to, you saw in the PSR that

13  Dr. Hunter had his diagnosis and prognosis and course of the

14  defendant and he diagnosed his depression as secondary to his

15  legal issues.  That was his opinion.  All right.  And your

16  diagnosis, as you testified earlier, is that his depression,

17  in addition to his social anxiety, go hand in hand with his

18  compulsive gambling, in fact may have fed into that or

19  somehow caused that, correct?

20  A    Correct.  That's what's caused the -- they're together

21  so they feed off each other.

22  Q    All right.  So the two of you don't -- don't agree on

23  that?

24  A    I haven't spoken to him about it but on paper it would

25  appear that way, yes.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    41

FONG - CROSS

1   Q     On paper you don't.  But you obviously would have to

2   agree that The Problem Gambling Center treated him longer and

3   more intensively than your one meeting?

4   A     Yes.

5   Q     Correct?

6   A     Correct.

7   Q     And I did mean to ask you, did you independently test

8   Mr. McAuliffe or did you rely on the tests that were

9   administered previously in your DSM-IV pathological gambling?

10  A     To -- yeah, so I independently tested him.

11  Q     So his answers were different?

12  A     Yes.

13  Q     So on your test he scored 10 out of 10 and on the other

14  test he scored five out of 10?

15  A     Correct.

16  Q     He provided different answers?

17  A     Correct.

18  Q     Okay.  Now -- and Dr. Hunter did not diagnose Mr.

19  McAuliffe as having a social anxiety at all.  That wasn't

20  part of the diagnosis?  You said he had no other conditions

21  other than secondary depression due to his legal situation?

22  A     Mm-hmm.  So are you asking how I came to that

23  diagnosis?

24  Q     No, I think -- I think you -- well, I don't know that

25  you explained how you came to the diagnosis.  How did you?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    42

FONG - CROSS

1   A    So in the course of the interview with Father McAuliffe,

2   if I detected signs and symptoms that made me think that

3   perhaps a social anxiety disorder was present.  So I

4   administered what's called a Liebowitz Social Anxiety Scale

5   which is a diagnostic tool we use to assess for social

6   anxiety, specifically for social anxiety.  His total score

7   on that was on the -- on the higher range than normal.  So

8   that's how I came to use that diagnosis for social anxiety

9   disorder.

10  Q    But you concluded it had been there along with the

11  depression for many years?

12  A    Correct.

13  Q    Well, the fact that on December 2nd Mr. McAuliffe may

14  have been feeling a high measure of social anxiety doesn't

15  necessarily tell you that he had experienced that for many

16  years other than his self-reporting, does it?  That test

17  doesn't tell you that, does it?

18  A    Right.  No, the test tells you symptoms not only how

19  people feel right there in the moment but it would have been

20  from lifetime.  And then it's corroborated, of course, with

21  self-report and history and as -- and again, that diagnosis

22  is made against the criteria that we have in the DSM-IV.

23  Q    Well, you would have to, I would imagine, look at other

24  -- again objective measures.  I mean once again the MMPI may

25  have been useful for measuring social anxiety and depression.

FONG - CROSS

1   You said earlier that was a useful tool --

2   A    Mm-hmm.  Correct.

3   Q    -- that wasn't performed.

4   A    Correct.

5   Q    You are aware, I'm sure, of the enormous media attention

6   that is over this case and over Mr. McAuliffe, of course,

7   correct?

8   A    Correct.

9   Q    One would expect that under the circumstances any

10  individual would experience a tremendous amount of social

11  anxiety, wouldn't you?

12  A    I would expect that but some of the elements of social

13  anxiety on the questionnaire aren't necessarily going to be

14  driven by a court case or by a current situation.  They're

15  livelong symptoms such as using the phone or being --

16  Q    He's afraid of using the phone, is that what you're

17  saying?

18  A    Well, as an example one of the questions on the -- on

19  the Liebowitz Social Anxiety Scale --

20  Q    Well, more specifically to him what -- cause I don't

21  have the test, so --

22  A    Right.  Okay.

23  Q    -- that you administered so how did you arrive at your

24  conclusion?

25  A    Basically from the way Father McAuliffe tells his life

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    44

                        FONG - CROSS

1   story and his life narrative of repeated patterns of social

2   isolation, preferring to be alone, describing periods of

3   avoiding things in public or avoiding certain things where he

4   could be in the eye of public scrutiny.  And so the first

5   thing I would ask is, well, wait a minute, you're a priest.

6   How can you be a priest and that's a most public profession

7   of all, how can this be?  And oftentimes we see this is that

8   social anxiety, you know, patients suffer quietly from these

9   feelings of isolation and fears of scrutiny and they can do

10  their job to a certain degree but they still have those

11  symptoms that they endure throughout the day.

12          THE COURT:  I'm going to give you five more minutes.

13  Are you about finished with him?

14          MS. BROWN:  I'm close here.  Yes.

15  BY MS. BROWN:

16  Q    Now the defendant reported that he -- let's see, I'm

17  going to move forward.  The pathological gambling is an

18  impulse control disorder, isn't that right?

19  A    Correct.

20  Q    It's not a delusional disorder?

21  A    No.

22  Q    So the defendant, he knew that he was stealing, right?

23  A    Yes.

24  Q    And he said that he felt guilt and shame about doing it,

25  right?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
                                                            **Testimony of Dr. Fong**
                 NW TRANSCRIPTS, LLC - Nevada Division
                              P.O. Box 890
                         Nampa, Idaho 83653-0890
                 (208) 989-3455 - gayle@nwtranscripts.com            45

FONG - CROSS

1   A     Correct.

2   Q     So all compulsive gamblers, they do not resort to

3   stealing, right?

4   A     Correct.

5   Q     And one of the things they frequently do is try to stop

6   or slow down on their own because they recognize they have a

7   problem.  You testified to that?

8   A     That's not always true but sometimes, absolutely try and

9   stop or slow down on their own, yes.

10  Q     All right.  And did he say that he did?

11  A     Yes.

12  Q     Now if they're sincere in wanting to get help and

13  they're aware of counseling programs they can avail

14  themselves of those, correct?

15  A     Correct.

16  Q     And you said earlier you talked about motivation and

17  the motivation needs to be high enough for them to stop,

18  correct?

19  A     Correct.

20  Q     Did you know that the defendant was -- had access to

21  private counseling because you wrote in your report that he

22  didn't have any means to get treatment or get counseling.

23  Did you know that he access to private counseling through his

24  insurance?

25  A     Yes, I'm aware of that.  Correct.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12   **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    46

FONG - CROSS

1  Q    Okay.  So it's not -- it's not exactly accurate that he

2  didn't have any way to get treatment?

3  A    It's not the -- it's not accurate in the sense that he

4  could access treatment and pay for it, yes.  That part is

5  correct, yes.

6  Q    And you were aware that he was questioned on May 18th

7  regarding the misappropriation of church funds and was able

8  to stop gambling after that day you testified to that

9  earlier, correct?

10 A    Correct.

11 Q    So apparently the investigation was sufficient to

12 motivate him to stop gambling, correct?

13 A    Correct.

14 Q    Whereas before the guilt and the shame that he reported

15 were not sufficiently motivating to stop him from gambling,

16 correct?

17 A    Correct.

18 Q    You also made a statement in your report that all of the

19 money that he stole was for gambling, do you recall that?

20 A    I do recall that.

21 Q    Do you know that that's not accurate?

22 A    I understand that.  Correct.  Yes, that's not accurate.

23 Q    Do you know that he also stole $50,000 that was for

24 reasons completely unrelated to gambling addiction?

25 A    Yes, that's correct.

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    47

FONG - CROSS

1  Q     So do you still stand by your statement that the only

2  reason that he stole was for gambling addiction?

3  A     Well, I stand by my opinion that the only reason he

4  stole was to -- was either (a) from the symptom of gambling

5  addiction, or (b) to cover up the cons -- or (b) to address

6  the consequences of gambling addiction which would be to

7  payoff debts or pay for other things that one can't afford

8  because of the gambling addiction.

9  Q     You also said that one of the things that his urge to

10 gamble caused his theft and the money was easy there at the

11 church or you testified something about that.  But don't you

12 find it significant or do you find it significant that he did

13 not exhaust all of his own money to fund gambling, instead

14 stealing is a first instinct from the church?

15 A     Well, my understand was that he did not -- that he

16 exhausted all liquid forms of money he had to him, that he

17 could access right away that same day.  But again my opinion

18 in thinking about the situation is that he had a unique

19 situation where he had access to large amounts of cash right

20 there, right in front of him every day.  And also that there

21 was no other -- I don't know the specific and I'm not aware

22 of any other person who is -- had access to -- I don't know

23 who else had access to the box or who was watching the total

24 amount of money in the box.  But what's unique -- and this

25 is where it's a little different from my other patients,

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    48

FONG - CROSS

1   there was cash, untraceable cash, that was in front of him

2   every day.

3   Q    So in other words it was -- he had a $30,000 investment

4   account, did you know that?

5   A    I was aware of that, yes.

6   Q    Okay.  All right.  I'll move on.  Now you say that he's

7   responding well to Gambler's Anonymous and Gambler's

8   Anonymous has been around for a long time, right?

9   A    Correct.

10  Q    Did you know also that he had -- there were -- there

11  were Catholic -- the Catholic Church has centers in

12  Philadelphia, in Michigan, in Houston and Toronto that are

13  dedicated to addiction issues, including gambling.  Are you

14  familiar with those centers?

15  A    I've heard of them but I'm not intimately familiar with

16  them.

17  Q    And did you know that he had arranged counseling for

18  other priests --

19  A    I was aware of that, yes.

20  Q    -- due to his positions?  All right, so are you saying

21  that in your conversations with him he didn't seek counseling

22  cause he didn't think it would help?  He had just made the

23  decision he didn't think it would help, is that right?

24  A    My -- well, part of why he didn't seek help but the

25  greater issue as I -- as I opinion -- in my opinion is that

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    49

FONG - CROSS

1   he didn't seek help because of the shame and the stigma and

2   the embarrassment associated with coming out with this

3   addiction publicly or even privately to other members of the

4   community.

5   Q    So based on that reason and based on the pattern here of

6   the nine years of activity, would you agree that if he had

7   not been caught by law enforcement he would have continued in

8   this pattern and still have continued to defrauding the

9   church to this very day?

10  A    It's hard to predict what could have happened.  That's

11  certainly one possibility.  He could have also had an

12  intervention done by someone who noticed something.  He could

13  have, later on at some point realized I do need help and

14  sought help volitionally.  That's just all speculation.

15          MS. BROWN:  That's all, Your Honor.

16          THE COURT:  All right.  Thank you.

17          MS. STANISH:  Your Honor, I know you're -- you have

18  a time schedule so I'll keep this very brief --

19          THE COURT:  Sure.

20          MS. STANISH:  -- if you would indulge me?

21          THE COURT:  But I -- no, I do want to give you a

22  chance for redirect.  Go ahead.

23          MS. STANISH:  Thank you, sir.

24  ///

25  ///

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    50

FONG - REDIRECT

**REDIRECT EXAMINATION**

BY MS. STANISH:

1

2

3 Q    Dr. Fong, are you familiar with Dr. Hunter's --

4 A    I am.

5 Q    -- Problem Gambling Clinic?

6 A    Yes, I am.

7 Q    And what was introduced there was just a fraction of the

8 therapy records from that clinic, is that correct?

9 A    Correct.

10 Q    And is -- does the group therapy, if you know, in Dr.

11 Hunter's clinic, does that -- would he have access to those

12 records?

13 A    Who?

14 Q    That's a bad question.  Forget I asked it -- asked that.

15 A    Okay.

16 Q    Would Dr. Hunter -- would his --

17         COURT RECORDER:  [unintelligible].

18         MS. STANISH:  I'm sorry.

19 BY MS. STANISH:

20 Q    Would Dr. Hunter rely on the group therapy records?

21 A    No.

22 Q    Would Dr. Hunter's be -- let me go back to the DSM.

23 That document, it states he checked to the question, "Have

24 you ever stolen anything?"  He checked "No," is that

25 correct?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    51

                      FONG - REDIRECT

1   A    Correct.

2   Q    Is your experience, in your clinic, when people who --

3   when people are suffering from addictions and they first

4   come to your clinic, do they fill out these forms without any

5   intervention by a professional?

6   A    The way it happens at our clinic at UCLA we give them

7   similar forms of this.  We have 'em fill it out themselves

8   and/or, you know, fill it out with a family member

9   accompanying them.  But one of the things that happens,

10  particularly for people who are in need of treatment is they

11  don't know what the signs and symptoms are of the disease or

12  they're frankly still very much in denial and shame, don't

13  want to admit to certain signs and symptoms that become

14  revealed later on in the course of treatment.

15  Q    And is it the case that that form could very well have

16  been filled out on the very first day when he checked in

17  without that kind of intervention or knowledge?

18  A    Correct.

19  Q    Is your -- what's your experience about people who have

20  addictions when the FBI or somebody confronts them there for

21  the very first time are -- are they at that point enlightened

22  and know everything about their addiction?

23  A    There's a wide variety of responses.  Some people come

24  in and they're just in shock and tell everything single thing

25  and, you know, are completely and fully honest.  Others have

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing**
                                                        **Testimony of Dr. Fong**
                  NW TRANSCRIPTS, LLC - Nevada Division
                              P.O. Box 890
                          Nampa, Idaho 83653-0890
                  (208) 989-3455 - gayle@nwtranscripts.com          52

FONG - REDIRECT

1   struggled with acceptance of what the illnesses are.  Others

2   are completely ignorant of what they're signs and symptoms of

3   their disease are.  Oftentimes what we do in clinical

4   practices that we rely less on formal diagnostic, quote,

5   "criteria," and really just looked at signs, symptoms, and

6   harm.  It is undoubtedly at the time when Father McAuliffe

7   entered treatment in June the harm was enormous.  And -- but

8   the same time the actual understanding and insight into

9   what's -- the signs and symptoms of that disease are wide

10  and variable in people when they show up for their first

11  visit.

12  Q    Let's -- let me refer your attention to the -- by the

13  way you did know -- you did, in the PSI, you had the PSI and

14  the government's sentencing memorandum, correct?

15  A    Correct.

16  Q    And so you were familiar with all the details of the

17  offense, at least as related in those two documents?

18  A    Correct.

19  Q    So you did have more than just Father McAuliffe's

20  explanation of the offense, you had the United States and the

21  PS -- or the probation officer's information as well?

22  A    Correct.

23         MS. BROWN:  Correction, if I may.  I didn't have --

24  she said my sentencing memo.

25         MS. STANISH:  Pardon?

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    53

FONG - REDIRECT

1   MS. BROWN:  He didn't have my sentencing memo, I

2 had a plea agreement.

3   MS. STANISH:  I'll correct that.

4 BY MS. STANISH:

5 Q Was -- you read the sentencing memorandum after you

6 wrote your report, correct?

7 A Correct.

8 Q Was there anything in that document that alters your

9 opinion that this man is a pathological gambler?

10 A No.

11 Q And with respect to the -- some $50,000, was that in

12 connection with the credit cards that he used his credit

13 cards to reimburse personal expenses?

14 A Okay, correct.

15 Q Okay.  Does that -- does that make a difference to you

16 that that card was used for personal experiences?  Does that

17 change your opinion?

18 A No.

19 Q Why?

20 A Because people need to spend money on things for

21 themselves and, you know, against the larger picture of the

22 other funds that were stolen to me, I don't know the exact

23 context of that 50,000.  Was it spent because of gambling

24 debt or was it spent just because that's regular living

25 expenses?  Was it spent with -- what were the exact things

2:11-CR-0365-JCM-RJJ  U.S. v. McAuliffe  1/13/12  **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com  54

FONG - REDIRECT

1  purchased with those 50,000?  I don't know those details.

2  Q   So if it's personal things like travel or food, presents

3  for people, would the use -- that 50,000 free up his other

4  money for gambling purposes?

5  A   Not likely, no.

6  Q   The $30,000 that he had access -- or that was part of

7  the investment funds, did he have free access to that money?

8  A   My understanding is he did not.

9  Q   And why is that, do you recall?

10  A   I recall asking him and also speaking with you that it

11  was not like a checking account or bank account or like in

12  some -- it was some sort of investment in something that you

13  just can't go in and pull out funds from.

14  Q   The government -- the government has suggested that

15  your testimony is purchased today.  What's your response to

16  that?

17  A   I'm sorry, can you say that again.

18  Q   The government seems to have suggested that your

19  testimony today was purchased, but what's your response to

20  that?

21  A   Well, I mean, you know, I've heard that in several cases

22  before.  I mean my stance on this is as a -- to be as a

23  medical expert is to be as objective and to answer the

24  questions in a scientific fashion.  My professional

25  credibility is on the line, you know, if I just say something

2:11-CR-0365-JCM-RJJ     U.S. v. McAuliffe     1/13/12     **Portion of Sentencing
Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    55

FONG - REDIRECT

1   the lawyer wants me to say then I'm not being a very good

2   medical expert in the matter.  So I wouldn't say that my

3   opinions here were purchased or forced or restocked.

4   Q    Is there anything about the inability or the lack of

5   time to interview other people who knew Father McAuliffe,

6   would that have made a difference in your opinion?

7   A    I don't think so.  I mean it's always nice -- it's

8   always -- it's an idea -- in an ideal world we would

9   interview every single person that came across Father

10  McAuliffe in his life, you know, from childhood, all of that,

11  but then there's just practicalities and really it's just

12  not practical or possible to interview additional people and

13  -- for a case like this in the time period that existed.

14  Q    And how many people have you diagnosed in the past as

15  pathological gamblers?

16  A    A gross approximation, probably over a thousand.

17  Q    And would you say that anything about Father McAuliffe

18  is different from those thousand people that you diagnosed

19  with gambling addictions?

20  A    Well, I would say that of those approximately a

21  thousand, you know, every person has a story that's

22  different.  There's some very clear similarities in their

23  signs and symptoms and how their illness presents and

24  there's a lot of unique factors about their case, but that's

25  true in every single medical illness.  I think again in

2:11-CR-0365-JCM-RJJ       U.S. v. McAuliffe       1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    56

FONG - REDIRECT

1   Father McAuliffe's case I think what's unique is the severity

2   of the condition that went untreated and unaddressed for so

3   long.  And I think one of the most unfortunate things is that

4   that's where the consequences can happen and be undetected

5   for years.

6   Q    The government appears to be suggesting that Father

7   McAuliffe is not a pathological gambler, that he's somehow

8   making this all up.

9   A    Mm-hmm.

10          THE COURT:  You're a master at understatement.

11          MS. STANISH:  Pardon me?

12          THE COURT:  You're a master at understatement.

13          MS. STANISH:  I'm trying to be kind.

14      [Laughter]

15  BY MS. STANISH:

16  Q    What based on your experience, based on your testing of

17  the doctor, what's your response to that allegation that he's

18  making this all up?

19  A    Well, it's my medical opinion that Father McAuliffe is

20  a pathological gambler as determined by my evaluation and

21  that's my medical opinion.  I've also seen a lot of other

22  cases similar where I said this person is not a pathological

23  gambler based on them not meeting criteria or based on them

24  telling me signs and symptoms that just don't add up.  They

25  just are false.  You know, I would stake my professional

FONG - REDIRECT

1  reputation on this and that's my diagnosis and I would stand

2  by my diagnosis that I arrived at.

3  Q    And the government also seems to be suggesting that he's

4  just gambling for fun.  Is there anything about your

5  understanding of his gambling problems that would say this

6  was not such a fun thing for him?

7  A    I mean the way I describe it is that people gamble for

8  two reasons, they gamble to have fun or they gamble to feel

9  normal.  Pathological gamblers don't gamble for fun, they

10  gamble for escape, for -- to respond to the urges and the

11  compulsivity that they have.  It's not normal for someone

12  for pathological gamblers -- what's not normal is that

13  pathological gamblers come home and instead of going to

14  sleep or wanting to go to sleep, instead they have intense

15  urge, a craving, they -- a hunger for gambling that can't be

16  satisfied.  They don't want that hunger.  Sometimes they do,

17  sometimes they don't.  But over time that hunger, that need,

18  the compulsion overwhelms to the point where they can't

19  escape from that.  The only way to escape is to be gambling.

20  So I've never met -- any of my patients who said I wanted to

21  become addicted to gambling.  Every single one of the

22  patients have said, yeah, gambling is fun, entertaining for

23  me in the beginning but at some point during my gambling

24  career it tipped.  It went over to become a problem and I

25  couldn't stop.  I -- that's the part that I couldn't manage

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12    **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    58

FONG - REDIRECT

1   and when harm came, I couldn't pull back.  As much as I

2   wanted to I could not do that.

3   Q    One last question, I hope, in -- Ms. Brown asked you

4   why wasn't the shame and guilt that Father McAuliffe

5   experienced with his gambling, why wasn't that enough to

6   make him wake up and smell the java that he had a gambling

7   problem?

8   A    It's one of the fascinating questions we have in our

9   field is what makes people seek treatment.  The shame and

10  guilt that Father McAuliffe felt was suffering, to put it

11  bluntly.  And he suffered with it every day.  Same thing I

12  see all the time when I was in medical school and residency

13  was why did some people with metastatic breast cancer not go

14  to the doctor when the cancer spread all the way to their

15  skin?  It's a question that, you know, it's an individual

16  question but we know that when recovery happens, it happens

17  for all sorts of reasons.  I think in this case it took the

18  federal prosecution to elevate to make the conditions right

19  to seek treatment.

20          If the prosecution never had occurred could there

21  have been other conditions where treatment were to be sought?

22  Absolutely.  But in this case it just happened to be that

23  that's when treatment was sought was when the Federal -- when

24  the case came down.

25          MS. STANISH:  I have nothing further.  Thank you,

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com                    59

```
                        FONG - REDIRECT
 1  Doctor.

 2              THE COURT:  All right.  Thank you.

 3              And you may -- we've got to put an end to this

 4  sometime so I'm going to cutoff the questioning of the

 5  witness at this time.  All right?

 6              Thank you for your time, sir.  You may step down.

 7                        *  *  *  *  *

 8              PROCEEDINGS CONTINUED AT 11:20:17 A.M.

 9                    AND NOT TRANSCRIBED

10                        *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATION

I (WE) CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

**NW TRANSCRIPTS, LLC**
**NEVADA DIVISION**
**P.O. BOX 890**
**NAMPA, IDAHO 83653-0890**
**(208) 989-3455**
**gayle@nwtranscripts.com**

/s/ Gayle Martin-Lutz
FEDERALLY CERTIFIED MANAGER/OWNER

Kay McCrea                                          3/7/12
TRANSCRIBER                                         DATE

2:11-CR-0365-JCM-RJJ      U.S. v. McAuliffe      1/13/12      **Portion of Sentencing**
**Testimony of Dr. Fong**
NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwtranscripts.com      61